Rebecca A. Patterson, AK Bar No. 1305028
rebecca@sonosky.net
Lloyd B. Miller, AK Bar No. 7906040
lloyd@sonosky.net
SONOSKY, CHAMBERS, SACHSE,
MILLER & MONKMAN, LLP
725 East Fireweed Lane, Suite 420
Anchorage, AK  99503
Telephone:  (907) 258-6377
Facsimile:  (907) 272-8332

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| SOUTHEAST ALASKA REGIONAL HEALTH CONSORTIUM<br>3100 Channel Drive, Suite 300<br>Juneau, Alaska 99801,<br>       Plaintiff,<br><br>v.<br><br>CHRISTOPHER MANDREGAN, JR.<br>Director<br>Alaska Area Native Health Service<br>4141 Ambassador Drive, Suite 300<br>Anchorage, Alaska 99508<br>    and<br><br>MICHAEL WEAHKEE<br>Acting Director, Indian Health Service<br>5600 Fishers Lane<br>Rockville, MD 20857<br>    and<br><br>ALEX AZAR<br>Secretary of the U.S. Dep't of Health<br>  and Human Services<br>200 Independence Avenue, S.W.<br>Washington, D.C. 20201<br>    and<br><br>UNITED STATES OF AMERICA,<br>       Defendants. | Case No. _____<br><br>**COMPLAINT** |

The SouthEast Alaska Regional Health Consortium, by and through its attorneys Sonosky, Chambers, Sachse, Miller, & Monkman, complains and alleges as follows:

## I. INTRODUCTION

1. SouthEast Alaska Regional Health Consortium (SEARHC) seeks injunctive relief to compel the Secretary to fully fund its fiscal year (FY) 2019 Funding Agreement for the operation of certain health care programs, services, functions, and activities (PSFAs). SEARHC believes it is owed an additional $352,213 for FY 2019.

2. The Indian Health Service (IHS), SEARHC and the Yakutat Tlingit Tribe (YTT) spent years discussing the proper amount that should be taken from SEARHC's total funding amount and transferred to YTT as a result of YTT's withdrawal from SEARHC. IHS offered several iterations of calculations displaying various amounts throughout these conversations, and IHS issued a decision on that amount in July 2018. After that decision, SEARHC attempted to engage IHS in further discussions on the proper amount that should be awarded to SEARHC for FY 2019, but IHS refused. Therefore, SEARHC submitted a final offer to the agency under the Indian Self-Determination and Education Assistance Act (ISDEAA), 25 U.S.C. § 5387(b), requesting additional funding for FY 2019. The Secretary rejected SEARHC's final offer in its entirety.

3. Defendants rejected the final offer on the grounds that "the amount of funds proposed by the SEARHC 'exceeds the applicable funding level to which [the SEARHC] is entitled,'" under 25 U.S.C. § 5387(c)(1)(A)(i). Additionally, Defendants rejected the final offer because it claims SEARHC "lacks recourse to challenge the IHS's determination regarding the YTT's withdrawal," under 25 U.S.C. § 5387(c)(1)(A)(ii).

4. Defendants' assertions are both legally and factually incorrect, and the Secretary has breached his legal obligations to SEARHC and violated the ISDEAA. As the Secretary has not met his "burden of demonstrating by clear and convincing evidence the validity of the grounds for rejecting the offer," 25 U.S.C. § 5387(d), this decision must be reversed. SEARHC seeks an injunction overturning IHS's decision and compelling IHS to award an additional $352,213 to SEARHC for its FY 2019 Funding Agreement.

## II. JURISDICTION

5. This Court has jurisdiction over this appeal pursuant to 25 U.S.C. § 5331(a) of the ISDEAA, and 28 U.S.C. §§ 1331, 1362.

## III. PARTIES

6. SouthEast Alaska Regional Health Consortium is a tribal organization with its headquarters in Juneau, Alaska. SEARHC currently provides healthcare for 17 Native communities in Southeast Alaska, serving the Tlingit, Haida, Tsimshian, and other Native people living in Angoon, Craig, Haines, Hoonah, Hydaburg, Juneau, Kake, Kasaan, Klawock, Klukwan, Pelican, Petersburg, Sitka, Skagway, Thorne Bay, and Wrangell. Up until FY 2019, SEARHC also provided services to Alaska Natives residing in Yakutat. SEARHC qualifies as a "tribal organization" under 25 U.S.C. § 5304(*l*), and as an "Indian tribe" under 25 U.S.C. § 5381(b).

7. Alex Azar is the Secretary of the U.S. Department of Health and Human Services. Secretary Azar exercises delegated responsibilities from Congress pursuant to the ISDEAA and other applicable law.

8. RADM Michael Weahkee is the Acting Director of the Indian Health Service. Admiral Weahkee exercises authority delegated to him by the Secretary to carry out the

Secretary's responsibilities under the ISDEAA and other applicable law. IHS is the agency within the DHHS that is responsible for providing, administering and overseeing federal health services to American Indians and Alaska Natives. As used throughout this Complaint (and unless context commands otherwise), the terms "Secretary," "HHS," "Director" and "IHS" are used interchangeably.

9. Christopher Mandregan, Jr. is the Director of the Alaska Area Native Health Service, a part of IHS. Mr. Mandregan exercises authority delegated to him by the IHS Acting Director to carry out the agency's responsibilities under applicable law.

## IV. FACTS AND GENERAL ALLEGATIONS

A. **The Indian Self-Determination and Education Assistance Act**

10. The purpose of the ISDEAA is to assure "maximum Indian participation" in the provision of services to Indian communities. § 5302(a).[1] The Act seeks to achieve this purpose through the "establishment of a meaningful Indian self-determination policy," which provides for the transition of federal programs serving Indian Tribes from IHS operation to tribal operation. § 5302(b).

11. When enacting the self-governance provisions in Title V of the ISDEAA, Congress found that "the Federal bureaucracy, with its centralized rules and regulations, has eroded tribal self-governance and dominates tribal affairs." § 5381 note (quoting Pub. L. No. 106-260, § 2(3), 114 Stat. 711 (2000)). Therefore, the self-governance program "was designed to improve and perpetuate the government-to-government relationship between Indian tribes and

---

[1] All citations refer to Title 25 of the United States Code, unless otherwise indicated.

COMPLAINT
*SouthEast Alaska Regional Health Consortium v. Christopher Mandregan, Jr., et al.*, Case No.
Page 4

the United States and to strengthen tribal control over Federal funding and program management." *Id*. (quoting Pub. L. No. 106-260, § 2(4)).

12. In enacting Title V, Congress called for "full cooperation" from the Secretary and his constituent agencies "in the implementation of tribal self-governance," including "to permit an orderly transition from Federal domination of programs and services to provide Indian tribes with meaningful authority, control, funding, and discretion to plan, conduct, redesign, and administer programs, services, functions, and activities (or portions thereof) that meet the needs of the individual tribal communities." *Id.* (quoting Pub. L. No. 106-260, § 3(2)(F)).

13. Under Title V of the ISDEAA, "[t]he Secretary shall negotiate and enter into a written compact [and a written funding agreement] with each Indian tribe participating in self-governance in a manner consistent with the Federal Government's trust responsibility, treaty obligations, and the government-to-government relationship between Indian tribes and the United States." § 5384(a); *see* § 5385.

14. "Each funding agreement required under [§ 5385](a) . . . shall, as determined by the Indian tribe, authorize the Indian tribe to plan, conduct, consolidate, administer, and receive full tribal share funding, including tribal shares of discretionary Indian Health Service competitive grants . . . , for all programs, services, functions, and activities (or portions thereof), that are carried out for the benefit of Indians because of their status as Indians without regard to the agency or office of the Indian Health Service within which the program, service, function, or activity (or portion thereof) is performed." § 5385(b)(1).

15. Under Title V, "[t]he Secretary shall provide funds under a funding agreement . . . in an amount equal to the amount that the Indian tribe would have been entitled to receive under

self-determination contracts under [Title I of the ISDEAA], including amounts for direct program costs specified under section 5325(a)(1) of this title . . . ." § 5388(c). Title I mandates that the direct program funding "shall not be less than the . . . Secretary would have otherwise provided for the operation of the programs[.]" § 5325(a)(1).

16. The Act also prohibits the Secretary from refusing to transfer, withholding portions of funding, or reducing the funding that a Tribe or tribal organization receives in subsequent years "except pursuant to" five specific authorizations or circumstances:

> (I) A reduction in appropriations from the previous fiscal year for the program or function to be included in a compact or funding agreement;
>
> (II) a congressional directive in legislation or accompanying report;
>
> (III) a tribal authorization;
>
> (IV) a change in the amount of pass-through funds subject to the terms of the funding agreement; or
>
> (V) completion of a project, activity, or program for which such funds were provided[.]

§ 5388(d)(1); *see also* § 5393(a)(2) (explicitly stating that nothing in that provision authorizes reducing the amount of funds a self-governance Tribe would otherwise be entitled to receive).

17. When an Indian tribe withdraws from a participating intertribal consortium or tribal organization:

> (A) the withdrawing Indian tribe . . . shall be entitled to its tribal share of funds supporting those programs, services, functions, or activities (or portions thereof) that the Indian tribe will be carrying out under its own . . . compact and funding agreement (calculated on the same basis as the funds were initially allocated in the funding agreement of the inter-tribal consortium or tribal organization); and
>
> (B) the funds referred to in subparagraph (A) shall be transferred from the funding agreement of the inter-tribal consortium or tribal organization . . . .

§ 5386(g)(2).

18.  When a tribe submits a final offer, the Secretary has 45 days to review that offer. § 5387(b). If the Secretary rejects that offer, the Secretary must provide

> a timely written notification . . . that contains a specific finding that <u>clearly demonstrates</u>, or that is supported by a controlling legal authority that—
>
> > (i)  the amount of funds proposed in the final offer exceeds the applicable funding level to which the Indian tribe is entitled under this subchapter;
> >
> > (ii)  the program, function, service, or activity (or portion thereof) that is the subject of the final offer is an inherent Federal function that cannot legally be delegated to an Indian tribe;
> >
> > (iii)  the Indian tribe cannot carry out the program, function, service, or activity (or portion thereof) in a manner that would not result in significant danger or risk to the public health; or
> >
> > (iv)  the Indian tribe is not eligible to participate in self-governance[.]

§ 5387(c)(1)(A) (emphasis added).

19.  If the Secretary rejects a final offer, the Secretary must also provide "the Indian tribe with the option of entering into the severable portions of a final proposed compact or funding agreement, or provision thereof, (including a lesser funding amount, if any), that the Secretary did not reject, subject to any additional alterations necessary to conform the compact or funding agreement to the severed provisions." § 5387(c)(1)(D).

20.  In a civil action challenging the Secretary's rejection of a final offer under one of the four reasons listed in paragraph 18, above, "the Secretary shall have the burden of demonstrating by clear and convincing evidence the validity of the grounds for rejecting the offer (or a provision thereof)." § 5387(d).

21. Any self-governance Tribe that alleges that a Compact or Funding Agreement improperly reduces funding for any programs under contract in violation of the Act may apply the special remedial provisions of §5331 and challenge such action in court. § 5395(a).

22. In interpreting the IHS's obligations, the Supreme Court has said that "[c]ontracts made under ISDEAA specify that '[e]ach provision of the [ISDEAA] and each provision of this Contract shall be liberally construed for the benefit of the Contractor . . . .'" § 5329(c), (model agreement § 1(a)(2)). *Salazar v. Ramah Navajo Chapter*, 567 U.S. 182, 194 (2012); *see also* § 5392(f) (similar Title V provision). The Supreme Court has interpreted this language to mean that the Government "must demonstrate that its reading [of the ISDEAA] is clearly required by the statutory language." *Ramah*, 567 U.S. at 194.

**B.    SEARHC's Contracting History**

23. Since 1976, SEARHC has operated various Federal health care programs, functions, services, and activities of the Indian Health Service within the IHS Mt. Edgecumbe Service Area pursuant to contracts between the IHS and SEARHC. Since the 1980s, SEARHC has operated the Juneau Clinic, and Mt. Edgecumbe Hospital pursuant to various contracts with the Indian Health Service, as initially authorized under Title I of the ISDEAA (25 U.S.C. §§ 5301-5332).

24. From at least fiscal year 1996 to present, SEARHC operated federal IHS programs pursuant to the Alaska Tribal Health Compact (the Compact) with IHS, as authorized

under Title V of the ISDEAA (25 U.S.C. §§ 5381-5399).[2] The tribally-operated federal healthcare services provided at SEARHC's various locations include medical, dental, optometry, physical therapy, behavioral health, health promotion and education services, as well as hospital services provided at Mt. Edgecumbe Hospital.

25. In or around 1990, the Yakutat Tlingit Tribe (YTT) first authorized Yak-Tat Kwaan, Inc. (YKI), the local Alaska Native Claims Settlement Act corporation, to provide community services in the village of Yakutat under a contract with IHS, including management of the community health center, health aide, and community health representative programs. In October 1995 (FY 1996), YTT proposed to continue providing these community-based services pursuant to a contract under Title I of the ISDEAA with its non-profit corporation, but it was later decided to allow YKI to continue operating the contract. The FY 1996 contract expanded the scope of services provided by YTT to include primary care, on-site emergency medical services, administration and management, mid-level practitioner supervisory services, community health aide/practitioner services, and community health representative services. On information and belief, at the time of these assumptions, the funds that were transferred to YTT were withdrawn from SEARHC by agreement between all parties (YTT, SEARHC and IHS).

26. This Title I contract was later converted to a Title V Compact and Funding Agreement, entered into directly by YTT, and the current scope of services provided includes mid-level practitioner services, community health representative program, family health care and

---

[2] The Alaska Tribal Health Compact has been amended and restated multiple times since the first version went into effect on October 1, 1994. The most recent version went into effect on October 1, 2010 (FY 2011).

COMPLAINT
*SouthEast Alaska Regional Health Consortium v. Christopher Mandregan, Jr., et al.*, Case No.
Page 9

health education program, ancillary and support services, emergency medical services, pharmaceutical, and mental health.

27. Throughout these contracts, YTT remained a member of SEARHC and left an unquantified portion of its "tribal shares" (i.e. annual funding) with SEARHC. In exchange, SEARHC continued to provide hospital-based and specialty services to YTT members and supported YTT's village-based operations, such as by providing pharmaceuticals, supplies, provider oversight, and paying patient travel expenses.

28. In 2013, YTT requested that IHS determine the amount of additional funding it would be entitled to if it withdrew from SEARHC. At that time, IHS produced a "discussion paper" (2013 IHS Memorandum) that stated "[b]ecause the IHS has not operated the MESU [IHS Service Unit operated by SEARHC] for many years and the Title V funding agreement with SEARHC is a lump sum the specific amount that accrues to an individual tribe is unknown."

29. The 2013 IHS Memorandum explains that a factor is necessary to determine a "tribal community location amount," and "factors that may be considered are active users, census population, tribal enrollments or workload data." The Memorandum goes on to discuss the various factors and concludes that "[i]f a divisor has to be employed to determine the Secretary's funding amount a workload utilization percentage gets closer to the intent of what the Secretary would have otherwise provided for the operation of the program than a per capita percentage."

30. The 2013 IHS Memorandum included calculations of SEARHC and YTT's recurring funding amounts for FY 2014 based on which of the divisors discussed in the memorandum were employed. IHS provided updated calculations in 2016 and 2017.

COMPLAINT
*SouthEast Alaska Regional Health Consortium v. Christopher Mandregan, Jr., et al.*, Case No.
Page 10

31. In December 2017 (during FY 2018), YTT decided to withdraw from SEARHC, effective April 1, 2018. This date was later extended to October 1, 2018, the beginning of FY 2019.

32. Throughout FY 2018, IHS held a series of negotiation calls and meetings with SEARHC and YTT regarding updated tables it had produced. Along with the "divisors" identified in earlier tables—workload methodology, active user count, and census population—IHS also explored other methods of determining a share for YTT, including a workload calculation based off of SEARHC's expenditures.

33. Despite promises to hold additional meetings with SEARHC, IHS instead issued a final determination on July 10, 2018 regarding the "portion of [SEARHC's] program funding [that] will be transferred to [YTT]." That letter stated that "$761,599 of funds for programs, services, function[s] and activities . . . currently in SEARHC's [ISDEAA] Title V Funding Agreement" would be transferred to YTT.

34. After a subsequent conversation with SEARHC, IHS issued a subsequent letter on July 19, 2018 to correct a "technical error" in the earlier calculations. This letter did not address any other concerns raised by SEARHC regarding SEARHC's FY 2019 funding amount. The letter determined that "$751,114 of funding currently in SEARHC's FA is attributable to the YTT."

35. On August 3, 2018, SEARHC submitted a final offer to IHS pursuant to § 5387(b) and 42 C.F.R. Part 137, Subpart H, "regarding the base funding amount due in SEARHC's FY 2019 Funding Agreement." That final offer discussed the background of the dispute between

SEARHC and IHS, identified that an impasse had been reached, and proposed that no more than $398,901 be withdrawn from its FY 2019 funding amount as a result of the YTT withdrawal.[3]

36. On September 14, 2018, IHS rejected that final offer on the grounds that "the amount of funds proposed by the SEARHC 'exceeds the applicable funding level to which [the SEARHC] is entitled." IHS also rejected the final offer on the grounds that "[t]he SEARHC lacks recourse to challenge the IHS's determination regarding the YTT's withdrawal."

37. SEARHC exercised its option to enter "into the severable portions" of the final FY 2019 Funding Agreement "that the Secretary did not reject," and that agreement became effective on October 1, 2018. § 5387(c)(1)(D). That agreement explicitly preserved SEARHC's right to challenge the September 14 decision in the Memorialization of Disputes attachment.

38. SEARHC now brings this action to challenge the Secretary's determination regarding its FY 2019 funding amount.

## V. FIRST CAUSE OF ACTION
(Unlawful Rejection of Proposed FY 2019 Funding Amount)

39. SEARHC incorporates all previous allegations of fact and law into this Cause of Action.

40. In its rejection letter, IHS asserts that SEARHC does not have standing to challenge IHS's determination of the amount that will be transferred from SEARHC's FY 2019 funding agreement to YTT because this is an "inherent Federal function" solely committed to agency discretion and only YTT has a right to challenge its funding decision upon withdrawal.

---

[3] The final offer also addressed proposed language for certain sections in its FY 2019 Funding Agreement under the heading "Other FY 2019 Language Changes." On August 30, 2018, SEARHC withdrew that portion of its final offer. For that reason, IHS's rejection of that offer and this litigation do not address that portion of the August 3 letter.

Under the ISDEAA, the Secretary may only reject a final offer for four specific reasons, and lack of standing is not one of those reasons. *See* § 5387(c)(1)(A). The Secretary's rejection therefore violates the ISDEAA on that basis.

41. The ISDEAA contains clear directions on the amount of funding a Tribe is entitled to receive each year, *see* § 5325(a)(1) (a Tribe is entitled to receive the same amount of funding the Secretary would have otherwise provided to run the programs under contract), and specifically allows Tribes to challenge such funding decisions, *see* §§ 5331(a), 5395(a). For this reason, the Secretary has not proved by clear and convincing evidence that SEARHC has no standing to challenge the amount of funds provided to SEARHC in FY 2019 and the Secretary's rejection violates the ISDEAA.

42. The ISDEAA explicitly prohibits the Secretary from reducing a self-governance Tribe's funding from year to year except for certain specified reasons. Withdrawal is not one of the reasons permitted under statute. § 5388(d)(1)(C)(ii). For this reason, the Secretary's actions violate the ISDEAA.

43. In its final offer letter SEARHC raised a number of concerns with IHS's use of the active user methodology to determine the amount to be reduced from SEARHC's FY 2019 funding amount. SEARHC asserted that the active user methodology does not reflect the basis upon which funds were initially allocated to SEARHC. This violates § 5386(g)(2)(A) of the ISDEAA, which mandates that when a Tribe withdraws from an inter-tribal consortium like SEARHC that serves multiple Tribes, that Tribe is "entitled to its tribal share of funds supporting those programs . . . that the [Tribe] will be carrying out under its own self-determination contract

COMPLAINT
*SouthEast Alaska Regional Health Consortium v. Christopher Mandregan, Jr., et al.*, Case No.
Page 13

Case 3:18-cv-00300-SLG   Document 1   Filed 12/20/18   Page 13 of 15

or compact and funding agreement (<u>calculated on the same basis as the funds were initially allocated in the funding agreement of the inter-tribal consortium . . .</u>)." Emphasis added.

44. SEARHC also explained in its final offer letter that the IHS's actions failed to protect the funding for services provided to the other seventeen Tribes included in SEARHC because its calculations relied on an average containing a significant outlier that skewed the calculation, because IHS sought to provide YTT a share of funds to which it is not entitled, and because IHS refused to lower certain funding lines for YTT even when such lower amounts were generated by IHS's preferred methodology. This too violates the ISDEAA, specifically 5324(i), which states "If a self-determination contract requires the Secretary to divide the administration of a program that has previously been administered for the benefit of a greater number of tribes than are represented by the tribal organization that is a party to the contract, <u>the Secretary shall take such action as may be necessary to ensure that services are provided to the tribes not served by a self-determination contract, including program redesign in consultation with the tribal organization and all affected tribes</u>." Emphasis added.

45. SEARHC's FY 2019 funding amount, as calculated by IHS, does not represent what the Secretary would have otherwise expended for operation of these programs and therefore the rejection of SEARHC's proposed amount violates the ISDA. § 5325(a)(1). The Secretary did not meet his high burden to demonstrate by clear and convincing evidence the validity of the grounds for rejecting the funding amounts proposed by SEARHC. SEARHC is entitled to immediate injunctive relief requiring the Secretary to award and fully fund the recurring funding amounts proposed.

# RELIEF REQUESTED

WHEREFORE, SouthEast Alaska Regional Health Consortium prays that this Court grant the following relief:

A. A declaratory judgment that the Secretary acted in violation of the ISDEAA by rejecting the Tribe's final offer regarding the recurring FY 2019 funding amounts; and

B. An immediate injunction compelling IHS to award the Tribe additional recurring program funds in the amount of $352,213; and compelling the immediate payment of these funds; and

C. Costs and attorneys' fees incurred in pursuing these claims, including the litigation before this Court, as provided for under the Equal Access to Justice Act, 5 U.S.C. § 504; 28 U.S.C. § 2412; 25 U.S.C. § 5331(c), and other applicable law; and

D. Such other monetary, declaratory and equitable relief as this Court may find to be just.

Respectfully submitted this 19th day of December 2018.

SONOSKY, CHAMBERS, SACHSE
MILLER & MONKMAN

By: *s/ Rebecca A. Patterson*
Rebecca A. Patterson
AK Bar No. 1305028
Lloyd B. Miller
AK Bar No. 7906040
725 East Fireweed Lane, Suite 420
Anchorage, AK 99503
Telephone: (907) 258-6377
Facsimile: (907) 272-8332
E-mail: rebecca@sonosky.net
lloyd@sonosky.net